The first matter and the only matter for this panel to hear is that of Hope v. Warden of York County, Warden of Pike County, the appellant to the United States, Mr. Stewart. Thank you, Your Honor. May it please the Court, I'm Scott Stewart on behalf of the United States. It is entirely up to you, but you free to take your mask off for your purposes if you wish to do so. I appreciate that, Your Honor. Thank you, Your Honor. That certainly makes it easier to hear myself. I hope it has a similar effect for you all. It will help us in hearing you as well. Are you reserving time for rebuttal, Mr. Stewart? Yes, Your Honor. My hope is to serve three minutes if I may. Very good. Thank you. In this case, the District Court's release of 20 aliens who together have decades of criminal history scanning a wide range of crimes. The District Court's release orders, which this Court has temporarily stayed, rests on serious errors of law, a profound misunderstanding of ICE's response to COVID-19 at York and Pike, and a flawed view of the equities. This Court should reverse. I'd like to begin, Your Honor, with the merits. The due process claim and the Eighth Amendment claim. What is this action? Has it been brought, and do you understand it to be a 2241 action? I think it's brought as a 2241 action, Your Honor. Our position is that it's not properly brought as a 2241 action. It is a conditions of confinement claim. Therefore, a conditions of confinement claim on the Supreme Court's reasoning in Kaiser v. Rodriguez, on this Court's reasoning in the Lemer case, a conditions of confinement claim is not properly brought as a habeas claim. Has that been entirely ruled out by the Supreme Court post-Kaiser? I don't think it has been entirely ruled out. It's been explicitly left open, hasn't it? I think, Your Honor, it's one of those. It's been left open, but with, I think, pretty compelling guidance as to what the right answer is. And I think Kaiser does go a long way in that regard. And I think most courts of appeals to have considered and really delved into the issue have, I think, similarly concluded that conditions are not a habeas. And as a practical matter, or even as a jurisprudential matter, do we need to resolve that issue for purposes of this appeal? I don't think so, Your Honor. I don't think it's a subject matter jurisdiction issue. I think it's a matter where the claim just kind of fails as a matter of law. I think it's another one of those reasons. And I think the court could readily just reject the due process or Eighth Amendment standard rulings and be fine to reverse on those grounds and not hit the 2241 vehicle issue. So we would just assume we have jurisdiction? I don't think it's a subject matter jurisdiction question. No, I agree with you on that. It's not a subject matter jurisdiction issue. Right. I think the court could, therefore, say, hey, we leave for another day whether this was brought in the vehicle, in the posture as a habeas vehicle. We can decide that another day. It's been left open if the court were to take that view, and we just reject it on the merits. I think that's right, Your Honor. And on the merits, Your Honor, to begin with the due process question, as we've explained, whether this court applies a punitiveness standard or a deliberate indifference standard at this stage, either one, the district court erred on this record in concluding that the conditions of confinement were unconstitutional. The conditions here, as demonstrated in the factual submissions that the government made in the district court, after, of course, the first release order, show that this is not punishment without due process of law. Two reasons where I think the district court really went astray here, two main reasons, Your Honor. One is that the district court discounted the government's very legitimate interests. The court, of course, didn't have before. Let's stop there before we get into what was before the district court in the way of requisite showings for purposes of the prerequisites, the full prerequisites of a PI, in this case characterized as a PRO. What struck me when I first read the district court's opinion was the fact that individual plaintiffs and petitioners were not considered on a particularized or specific basis, that the evidence that seemed to be required by the district court, at least as it applied to individual plaintiffs, was pretty sparse. I do recall that there was evidence concerning conditions, medical conditions, that each of the applicants suffered from, but it didn't seem to go beyond that, nor did the court's inquiry seem to go beyond that. And the court's inquiry also didn't seem to consider the prior records, criminal records or what have you, of any of the applicants for purposes of determining whether or not they represented some kind of public threat of any kind. Is that an accurate reading of the record at that stage? I think that you're right. The district court came in with a pretty broad brush here, Your Honor, where it had kind of episodic details of things. And I think it kind of honed in on – I'll put it this way. It took kind of a tapestry of somewhat individualized allegations. We're talking about folks with two facilities in this case. It's not clear who might be in the same block as one another and kind of extrapolated to a broad response. And here it just does not comply with constitutional standards. Obviously, the district court proceeded on a very, very swift timeline. And so I think it did end up painting far too broadly, certainly doing so in the absence of when it really needed to hear more from the government and just learn what was going on in the intervening time period since it had last heard about these facilities. The district court itself acknowledged, Your Honor, things here in addressing this type of pandemic unfolded at a very rapid rate. I want to say the district court's description was lightning speed. And that really behooved the district court, I think, to hear what is the government's response, what's it doing. And when we put in that response, we were able to show, look, we've done a lot of things at York and Pike. Screening at intake, limiting visitation, both facilities are, of course, well under capacity, educating detainees. We made recent changes that we flagged about how staff, contractors, and the like, cleaning, masks, all these different sorts of things that the district court, of course, couldn't account for. Those are all general activities, though. Following up on the chief judge's question, wasn't it incumbent upon the district court to make very specific findings with respect to each petitioner? And if so, those specific findings should relate not only to the individual medical condition of each petitioner and his or her potential risk status, but also individual findings as to each petitioner's criminal history, where they stood in immigration proceedings. Aren't all of those important facts that need to be found so the judge could make a determination about risk of flight, dangerousness to the community, et cetera? I think the answer is yes, Your Honor. Certainly, you'd have to dive into the facts in that kind of careful way the district court judge would to grant relief. I would say that the only answer I'd say is that the district court could, I think, I'm not sure that the district court has to probe the government's response as much once it's seen, oh, the government has actually responded in a way which, however we may characterize our view of it or whoever may, as a professional matter, have disagreements with it, it can't be classed as, say, deliberate indifference because that's on par with criminal recklessness. I don't know that it requires quite so much probing on that side, but I do think to grant this kind of sweeping relief, I don't think you can kind of do the blanket failure to consider whether these petitioners really are each being treated in a way that's constitutionally problematic. I mean, the typical habeas case, you know, a habeas case or due process case, it's a fact-specific, flexible, individualized type analysis, and I think, Judge Hardiman, that's somewhat what you're getting at to prevail on that. Well, did that occur here? I don't think so, Your Honor. Did either side here present any evidence or have any opportunity to present evidence on the issue of what the potential for harm was or might have been to the individual plaintiffs outside the prison setting? I think, if I can just refresh my – there was a brief addressing of some of the features of the problems presented by release in the second Dunn Declaration, Your Honor. I think those are mostly addressing harm to the community, addressing things like that. I don't think – I can't recall a presentation on exactly that point. Would you agree that that should be an essential part of the balancing that's inherent to the equitable relief that's sought here? I think it addresses the public interest, Your Honor. So it's an important – how is it surrounding communities? Well, part of the way it addressed the public interest, I think, was in enforcing the Constitution, which seems to be, at least by itself, something of a tautology. Of course, that's what every court is called upon to do, either explicitly or implicitly. Most of these questions you've been asking are really about process here more than anything. Right, and I think you're absolutely – as we've explained, and this is, of course, in Part 1B of our brief, and I think the Court's prior jurisdictional hits a number of these themes. The process here was very – it was an extreme procedural misstep, a very flawed process. It was not evaluated under the right standards. I will say, though, that based on what the government submitted, I think this Court is well-positioned to conclude, look, the plaintiffs did not meet their burden for this quite drastic injunctive relief. Judge Sirica, do you want to get in here, please? Oh, thank you very much. I just have one question. My understanding is that both institutions are following the CDC guidance. Tell me if I'm wrong on that. But there are two areas, and it appears a lot has been done to try to mitigate the spread of the disease. Two areas where perhaps that has not been done, and that's social distancing and cohort mixing. What is your comment with respect to those two items? Sure, Your Honor. I think as an initial matter, the facilities here are indeed trying to take a lot of steps to hit the themes outlined by the CDC. I will say that the CDC, a lot of what it says are caution, you know, when feasible, when possible, adaptations need to be made. So it's hard to always, and it recognizes detention as a distinct context, so it's hard to always make kind of an apples-to-apples mashup there. But I think, Your Honor, on your questions with respect to social distancing and cohorting, Your Honor, I would say two things. I do see my time's running out, but I'll try to answer swiftly, Your Honor. I think, first of all, at PIPE, and we addressed this, I believe, at paragraph 7B of the second or, sorry, 22B of the first DUN declaration. And at PIPE, the court explains, we're staggering people leaving cells to promote distancing. Detainees must distance when they're not in cells. Meals are served within cells. York, one thing I just want to tweak, and I think we didn't highlight, the York Declaration, I think my friend's right, we didn't, the declaration did not specifically speak in so many words of distancing, but it, too, addresses matters that I think promote distancing. One is that both facilities are well under capacity. And at paragraph 17 of the first DUN declaration, some notes are made regarding visitation. We've limited professional visits to non-contact visits at the facilities. In-person social visitation has been suspended. And CDC guidance has recognized that things along these lines, sort of work, remote work arrangements, people appearing telephonically for court hearings, those are social distancing-type strategies because they reduce, I think, the need for people to interact in closed spaces. So I do want to correct a piece, or clarify a piece at, I think, page 9 of our opening brief as to how York's declarations address distancing. I don't think they use it in so many words. Pike is more explicit about that with the staggering. As to cohorting, Your Honor, I think with respect that my friend for the petitioners misreads or overreads what the DUN declaration says, this is what my friend misses, and I think Mr. Dunn addressed this at page 120 of the record, paragraph 12, is that he's not saying in that piece that confirmed COVID cases are mingled with suspected cases. What he instead appears to be addressing is that suspected possible cases, asymptomatic cases, for example, are put together. And then if somebody tests positive, they're removed. And, you know, again, this is a situation where the CDC recognizes that adaptations need to be made, and individual isolation or quarantine may be an ideal mechanism, but in this challenging context, appropriate measures can be adapted and taken. I hope I've addressed your question. Yes, thank you. Just a practical question, what's the status of these 20 people? Are you monitoring them? Do you know where they are? I don't have the latest. As the Court knows, 19 of them were released. Some, I believe, fitted with ankle bracelets. I think there can be practical challenges with actually getting ankle bracelets on, Your Honor. One is we had to release people very quickly. Another is my understanding is a health condition. Does that mean you don't know the answer to my question? Yeah, I'm not sure of the answer. You don't know where these folks are or who's being monitored? One of the peculiar things, I thought, is that the judge said, well, they're going to have to check in. But they didn't have to check in with the government. Or are they checking in with the government? My – not that I know of, Your Honor. I believe in the related Thacker case, the court imposed requirements for – He required them to check in with counsel, didn't he, Thacker? You said it right, Your Honor. Even still, there were, unfortunately, some abstentions in Thacker, in the other case. But I'm not – But no abstentions here? Not that I'm aware of, Your Honor. Okay. I wish I had a clear answer to your question. All right. Thank you. Thank you very much. We'll have you back on rebuttal, Mr. Stewart. Thank you, Your Honor. Mr. Wolchak. Thank you. It pleased the court. Vito Wolchak, ACLU of Pennsylvania. On behalf of the petitioners, let me just pick up with the last question from Judge Hardiman. So, in fact, we filed on behalf of 22 individuals who were let out before. 21 are out. They are all sheltering at home. There have been road issues there. They are checking in with ICE as required. And as Mr. Stewart mentioned, about half of them were fitted with ankle monitors upon release. The other half were not. And the government chose not to fit them. There was nothing in the order that prohibited ICE from imposing those additional release conditions. Before – How do they check in with you? The order says weekly, I think? We spend a lot of time on the phone. Do they call you every Friday? I'm just curious about how that works, the logistics of it. There's regular communication. We talk to them about all sorts of issues, Your Honor. I don't think it's – Did you regularize anything after the court's order with respect to how they would be in contact, when, how frequently, anything of that nature? Your Honor, I don't believe we did actually regularize anything like that. Our understanding is that they are essentially out on supervised release by ICE, and so they are subject to whatever check-in or other conditions that ICE may choose to place on them. My understanding is that there have been check-ins that have been done with ICE with these entities. And does that mean that since our prior opinion in this case, that ICE is at liberty to pick them up again because it stays enlisted? Your Honor, I would argue they are not, unless they somehow violate their release conditions or commit another offense, and they have not. Okay, well, obviously that's not a question before us right now, but it seems to me that there is a huge gulf between what you know, Mr. Wolchek, and are indicating to us, and what Mr. Stewart knows and is indicating to us, which is to say I'm not hearing a lot of information from either of you as to just where these folks are, who they're reporting to, whether they're reporting to both you, Mr. Wolchek, and to ICE. Maybe I'm missing something, but this does not seem to be clear from the answers that I'm hearing. I'm not sure what Mr. Stewart knows. I don't know whether he's checked in with his ICE folks to know exactly what's going on. My understanding is they're as if on unsecured bail. I guess, especially with the folks that were subject to mandatory detention, some of your clients were subject to mandatory detention under Act of Congress, correct? And a district judge entered an order requiring their immediate release, and then that order was altered by our opinion to the extent that the stay was denied, right? But the government sought to stay at that. So I guess I'm wondering why you wouldn't be concerned that the current procedural state of the case means that your clients are at least at risk of or subject to being put back in the same position they were in before the litigation began. We're here. We're continuing to fight in the Thacker case. In fact, we're going to trial tomorrow on a class preliminary injunction, so we continue. On the injunction or on a Rule 23 certification motion? On both. All right. We're seeking a class preliminary injunction. Both of those motions have been merged. We're scheduled for a hearing. All right. Well, I think you mentioned that Thacker is a good segue, at least for my analysis of the case. The judge's April 27th opinion in Thacker addressed each petitioner individually, right, and talked a lot about the conditions of confinement, what's happening in the detention facilities, and the individual circumstances of these petitioners, not only their medical condition, but also their criminal history. So isn't that exactly what should have happened here? All right. So let me answer that by pulling the lens back and giving a little bit of context, because, frankly, what's before this court is the record as it existed before the district court on April 7th and April 10th. And, you know, it's not that long ago in some ways, but in this COVID world, it's a lifetime. So if you think back to what's happening in early April, this is the very front end of the pandemic. And literally what we're seeing on the news is body bags coming out of overcrowded hospitals in New York and Milan and Madrid. All of a sudden, people are being ordered to stay at home. Governor Wolf on April 1st ordered stay at home for the entire Commonwealth of Pennsylvania. There was one key reason for doing that, and that was to keep people separately, right, social distancing. There's no vaccine. There's no cure. And so people could catch this. There was also information that had come out by that point that there are people at critical risk. There is a group in the population, either because of advanced age or they have certain comorbidities, where the risk of death and serious illness is way higher. So the risk of death for people in this category is 15% at this point. But, right, they had to figure out who those people are, right? Isn't sort of step one identifying the high-risk people? Which we did. Well, let's look at Mr. Gebritz and I, age 28, Crohn's disease. What medications does he take? I don't see that anywhere in the record. So, Your Honor, first of all, so we presented information about the comorbidities that the folks had. We had a public health expert look at those and say that those confirm that, in fact, they are with the person at elevated risk. But isn't Mr. Gebritz and I, because of his Crohn's disease, at elevated risk because certain medications often associated with Crohn's patients render somebody immunocompromised? Isn't that sort of the basic medicine there on that? Your Honor, you're way above my level. Well, look, I'm not playing doctor here. What I'm suggesting is didn't there need to be some investigation as to, you know, he's a young guy. He's 28. You know, didn't there have to be some investigation into his circumstances before he was released? First of all, Your Honor, let me just suggest that the exercise that we're undergoing now is reviewing the facts that were before the court on a preliminary injunction appeal. We certainly know that, but respond directly to Judge Harneman's question. So the evidence before the court was that he had Crohn's disease. A public health expert attested that, in fact, according to the CDC, that put him at elevated risk. Even though he's at a younger age, I mean, that's the point of these comorbidities. It's not just in elderly people. The government has the medical records, and they submitted a response by Mr. Dunn, which the court plainly considered in the April 10th decision. They could have put in there and said, no, this is not true. But the judge's consideration on April 10th looked at the Dunn declaration through the lens of the very difficult standard that one must meet to win on a motion for reconsideration. Did it not? That was error, wasn't it? Sorry? That was error, wasn't it? Your Honor, I would not concede that's error because the standard before the court is the Rule 65 standard. And when you look at what the judge did in the April 7th decision, he very carefully went through the four-factor test. Before the court were 24 fact declarations from plaintiffs and two expert reports. When you say that this court did not have a full record covering all these issues, it's just not looking at the elderly. My question wasn't suggesting a paucity in the record. It was suggesting that when I read the district judge's opinion, which says that to prevail on a motion for reconsideration, one needs to come forward with some new evidence, et cetera, it seems clear that the standard of review applied by the district judge was the MFR standard of review, not looking at this de novo. Here's the point about that, Judge Hardiman, is that under that standard the only facts that the district court would be able to consider are facts that were not available to the other side, to the party at the time. The facts that Mr. Dunn submitted on April 7th as part of his declaration, I think they then resubmitted them a day or two later, were all available on April 7th. And nonetheless, the judge looked at those facts, reviewed those facts, mentions that in the opinion, so while he said he applied the reconsideration standard, in fact what he did, he did consider that factual evidence. So to the extent that there was new evidence submitted by the government after April 7th, the judge did look at that. Yeah, but it had to be new evidence to sort of get him to change his mind. It just was perplexing. Are there any cases, and I'm not blaming you for this, you didn't, as I read the record, you didn't ask for an ex parte PRO, did you? We did not. But he gave you one with no bond. I thought you gave the other side some form of notice before you went to him. So everything is moving light and fast. People are dying. We know that. It may be too quickly in the procedural history of this case. I referred earlier, what a lot of this is about is process, as I indicated to Mr. Stewart. Right.  District judges say that about Code of Appeals judges all the time. We do a lot of my, let me give Judge Sirica an opportunity. An occupational hazard. It is, or an occupational enjoyment. Judge Sirica, you should have an opportunity to get in here. No, I have no questions at this time. Your Honor, I want to come back to your question about the injunction. So we did give the government immediate notice because this is, frankly, a continuation of it. It is the exact same parties, the same attorneys for the government, the same attorneys for the petitioners. The only thing that changed was the actual petitioners. So we had just fully litigated this issue, and the judge issued the decision on it. That's how the April 7th order reads. It reads as if, I know who these people are. I know who these lawyers are. I've seen this movie before. I'm at the relief. Before the other side even has a chance to show up and say, wait a minute, there might be some differences here. Right. So, but if the court considers exactly what happened, much of the argument that we hear from the government today that we see in their brief is, the court ignored this or disregarded that or didn't appreciate, those are all factual arguments. And the standard for this court is that the record has to be absolutely devoid of any minimal evidentiary support. There is evidentiary support for everything that the district court did. What the court potentially did not consider, we ultimately don't know, it's not mentioned in the opinion, is the brief. And if the court compares the brief that was filed in Hope by the government with the arguments and briefs that were filed in Thacker a week earlier, it's the same arguments. And it's the same arguments we have today. The legal arguments haven't changed. So the only thing the court- Let me ask you this about Thacker. And I should know this, but I confess I don't. You can help me with this. Did the initial relief granted in Thacker have any of the sort of individualized analysis that we see in the district court's later April 27th opinion in Thacker? So there is a review of each petitioner's, I think, comorbidity or why they're placed at elevated risk, why they actually fit into what I'll call the class of at-risk individuals. But beyond that, no. But I think it is really important for this court to appreciate what irreparable harm is scaring- The irreparable harm is death, right? That is a good question. I have been trying all along here to understand exactly how we analytically characterize the harm. Is the harm risk? Is that what we're looking to? Risk. Risk of serious injury, risk of death. Is that the harm? Yes. I mean, that is the condition that's at issue is whether or not there is substantial risk to the individual. Okay. Then if risk is the harm, that really compels an individualized look at each plaintiff, does it not? Because the risk is going to be quantified based upon the condition someone suffers and a myriad of other factors. Ron, with all due respect, I don't believe that's right. Risk is that these individuals are going to catch COVID-19. Absolutely. That's what everybody in the world faces right now. Yes. Okay. But here's the thing. What you've got is a heightened chance of getting this virus. So if you'll think back to- The comorbidities don't increase the chance of getting it. The comorbidities increase the chance that you're going to die. Correct. But what we have is we've seen, and this was in the news at the time, is you have the cruise ships, you have the aircraft carriers, you have nursing homes. These are all facilities that are closely clustered, and what happens is once the virus gets in, it blows up and then things are out of control. And what's in the record before the district judge in this case is that between Thacker and when we filed help, which is less than a week, they've gone from zero infections inside these facilities to a handful of infections. And then between the 7th and the 10th, we have two deaths at Pike from infections. And in the news at the same time, you see numbers at Rikers and Cook County Jail going from a handful to hundreds. That's the backdrop on which the district court was considering this case. And the danger is that if that virus gets in, because they're not social distancing, because you don't have all these risk mitigation measures, maybe there's some masks, maybe there aren't. Look, we're all staying at home. Keith, I have a question that I found by posting. Yes. If I'm hearing you correctly, you're not pressing the due process inflicting punishment argument. Am I correct? The thrust of your argument is entirely on deliberate indifference. Your Honor, that is not correct. We don't believe deliberate indifference applies at all. I mean, that's Sharkey, which came out less than a year ago, which says pre-trial detainees or immigration detainees are subject to the same standard as pre-trial detainees. Neither one of them can be punished. And so, in fact, the deliberate indifference standard doesn't apply. So the question is whether or not these conditions are somehow legitimately related to government interest. The government's interest here is assuring that these civil immigration detainees appear at their immigration hearings or whether this is excessive. And what we have is that you hear about emergency proceedings and injunctions. And I remember Judge Sindrich saying, yeah, but nobody's going to live or die in this case. In this case, they are. Right, but that's clearly the risk is potential death. But one of the things that I'm wrestling with is when I look at the district court's opinion in Thacker of April 27th, the judge looked at the records of the individuals. So what should happen, and this is a hypothetical obviously, what should happen if the person is suffering from very severe comorbidities, let's say three or four of them, and the person who was put into detention by ICE has two prior convictions for first-degree murder? Do you have to let him out? Because if this guy gets it, on my hypothetical, he's really at a high risk of dying. But his record also shows that he's a tremendous danger to the public. Or let's make it even more stark. Let's say that his prior convictions for first-degree murder were domestic violence, and the choice is to keep him in this facility where he might get COVID and die or send him back to his residence where he's with his spouse. Your Honor, it is a balance. And what we have on the one hand is, as Judge Smith wrote in the Palachovic v. Wetzel case, when you're looking at that suicide prevention, it's more than a mere possibility. There's a substantial risk. One in six, a little bit more than one in six, and that's playing Russian roulette. I'd say that's a pretty substantial risk. Now, obviously, it is a balance, and there needs to be and there can be an assessment of the risk by the offender. But first of all, if you've got the kind of record you're suggesting, Your Honor, I'm pretty sure that person's still sitting in a penitentiary somewhere. They're not in ICE detention. No, my hypothetical, they're in civil ICE detention being about to be sent back or attempted to be sent back to their home country because they've got prior felonies. That's right. But that's not uncommon. Maybe first-degree murder prior felonies are uncommon, but some pretty severe felonies are not uncommon for several ICE detainees, right? So a number of our clients span the gamut here. So we've got folks who've got no conviction. Right. And if it's a balance, if it's a balance, then each individual needs to be considered on their own peculiar facts, right? They can be. If you would drive this to a conclusion, please, Mr. Wolchek. We're six and a half minutes over, and I want to hear the rebuttal. Your Honor, I have one very important point that I have not had an opportunity to make, and that is that the record that is before this Court today does not reflect the reality of the risk and what's going on at those facilities today. And there's been a number of questions and discussion, and I can tell that you, Your Honor, are frustrated about not knowing what's going on there. I will tell you that Pike has over 80 infections in there. And for this Court at this time to order our clients back into detention, I would say is at minimum irresponsible. What we would ask is to the extent that this Court has, and we think the judge has made an ample record or has an ample record to support this decision and should be affirmed to the extent this Court disagrees, we would ask that you exercise your authority to allow our clients to stay at liberty. They are subject to supervision and monitoring by ICE and by the Court. There can be individualized determinations if absolutely necessary. Could we assume, and perhaps Mr. Stewart can speak to this, that your clients would necessarily go back to either of the facilities that are central to this litigation? Your Honor, a couple of our clients that Judge Jones ordered back, which shows the judge is capable of making those decisions, and he ordered these folks back. Two of them went back. All right, but that was not my question. I'll see what Mr. Stewart has to say. Thank you very much. Rebuttal, Mr. Stewart? Thank you, Your Honor. I'd be happy to make sure I answer any of the Court's questions, but there's one point that I would like to make, and I think it picks up on some of the themes that the panel has been hitting about, about the developments in Thacker and the like. I believe my friend described this case as a continuation of Thacker. With respect, if that's his view, that's tantamount to a confession of error, because as I think Judge Hardiman has been noting, the April 27th order in Thacker looks again at three facilities, including these two, and authorizes the re-detention of petitioners. So should we just remand this case so the district judge can make the same individualized assessment of each of these 20 people as he did in Thacker? I don't think so, Your Honor. I mean, it's an option. But I think the Court has enough of a record here to reject the constitutional claim on the merits. And what the Court ended up balancing in those pages in Thacker was, I think, really more the equities, and it did so based on, after making its separate merits conclusions. I think this Court can and should knock out this injunction at the merits, because it has that kind of a record that shows that there's not a due process violation and there's not a delivery indifference violation. And if we do that, you can't tell us whether you're going to try to re-detain these 20 people. Some you might, some you might not. You'll make an individualized determination at that point as to what the agency wishes to do? I think we have to look at our options, Your Honor. There are a number of competing considerations here. One is that ICE has taken measures to reduce the pertaining population. It has to consider the realities of, you know, now that somebody's been in the community, what does that mean for bringing them back into the facility? What are its other operational priorities? Does it have, I think, as Your Honor rates, I'm not sure that things would always necessarily go back to the same facility. That could depend on just operational realities, location of hearings, and just other considerations. But I think the point, Your Honor, I think to answer your question is that the agency should have the option. And that's right just under the law, under the fact that my friend's arguments fail on the merits and that ICE doesn't. All right. But if you do do that, then I assume you'll be right back in court with at least some of the folks. I assume Mr. Walchuk would then try to prove up his case as to why each person is re-detained. And that balancing act between their risk of contracting the virus and their risk of previous injury or death balanced against the risk of flight or dangerousness to the community. That would then happen, right? We could be back in court arguing those points, Your Honor. But I think then my friend would have to contend with a merits ruling that would potentially be saying, look, on these facts, there is no deliberate indifference. There is no punitiveness that's prohibited by the Constitution. Is it your argument that you can't be deliberately indifferent or you can't punish people as long as you're trying? That seems to be inherent in the government's belief that we're doing some things. Is that enough to do some things or do those things have to be efficacious? I think two points on that, Your Honor. One is that I think what we've emphasized here is that we've taken extensive and thorough responses. So I don't think the court has to see this as just like, you know, he doesn't have to get to the point of just how little effort would be enough. I would say that going back to Farmer v. Brennan, Your Honor, the Supreme Court and other courts have recognized that, look, if you take a reasonable response, even if you can't avert the harm or you fail to avert the harm, that doesn't mean it rises to a level of deliberate indifference. And I think that's what we're saying here. So you look at our extensive response borne out by the record, acknowledging a lot of these supplemental declarations in certain ways, you know, masks and temperature checks, things that the supplemental declarations in many cases point out, and you just say, look, the government, whatever it has done, it does not meet that subjective deliberate indifference standard and it does not hit the bar for punitive necessity. I'm well over time. Thank you, Your Honor. Judge Sirica, do you have anything for Mr. Stewart? No, thank you. Thank you very much. And a thank you to both of counsel. Certainly this court recognizes the importance not only of this case but of the issues presented by cases of this nature. And I will indulge myself in one observation with respect to the performance of the district courts circuit-wide. I am very proud of the district judges throughout the Third Circuit in their availability and the speed with which they have entertained applications of this nature, heard them and dealt with them. I think all of our judges have recognized the severity of the problem and the need to address that problem quickly. And irrespective of what this court does, I think our district judges deserve a real round of applause on this court.